UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Michael Slusarchuk,

Plaintiff,

Civil File No. 01-1405 (MJD/JGL)

v.

**MEMORANDUM AND ORDER**

John Hoff, individually and in his official capacity as Minneapolis Police Officer, Lance Faust, individually and in his official capacity as Minneapolis Police Officer, and the City of Minneapolis,

Defendants,

and

Elaine Stebleton, individually and as trustee on behalf of the heirs and next of kin of Jennifer Stebleton, deceased,

Plaintiff,

Civil File No. 01-1406 (MJD/JGL)

v.

John Hoff, individually and in his official capacity as Minneapolis Police Officer, Lance Faust, individually and in his official capacity as Minneapolis Police Officer, and the City of Minneapolis,

Defendants.

---

FILED 10-31-02
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

This matter is before the Court on Defendants' Motion for Summary Judgment. For the reasons that follow, the Court grants in part and denies in part Defendants' motion.

**BACKGROUND**

At approximately 11:30 p.m. on August 22, 2000, Minneapolis Police Officers John Hoff ("Hoff") and Lance Faust ("Faust") of the Third Precinct were on patrol in a marked squad car. Hoff was driving, and the officers were traveling east on 44th Street South in a residential area of Minneapolis. As they approached 4th Avenue South, the officers observed a black Mitsubishi stopped legally on 4th Avenue, facing south. Officer Hoff stopped at the four-way stop sign at the intersection of 44th Street and 4th Avenue. The Mitsubishi did not move for several seconds. The officers turned north onto 4th Avenue and drove past the Mitsubishi. Hoff shined the squad car's alley light into the Mitsubishi to observe the driver. As to what he observed, Hoff testified as follows:

Q And did you see if there was anyone in the car?
A Yes, I did.
Q Was there one person?
A It was a black male sitting - - sitting in the driver's seat.
Q Did you recognize that person?
A I didn't, no.
Q Did Officer Faust indicate to you he recognized that person?
A Officer Faust said that he thought it was Rico Howard.

(See Ginder Aff., Ex. C, State of Minnesota v. Rico Patrick Howard, Hennepin County Ct. Dist. File No. 00080738, Tr. of Officer Hoff at Rasmussen Hr'g., 10-11.)

Officers Hoff and Faust assert that they then discussed an outstanding probable cause pickup ("PC pickup") on an individual named "Howard." Hoff testified:

> As I turned, I shined the light on him. Turned slowly, as I proceeded slowly with the light, Officer Faust said that he believed that was Rico Howard. And then I said to him, I said, "Officer Faust isn't there a pick-up on a Howard, a PC pickup?" Which we - it's a PC at roll call. And we believed that, yeah, it was the Rico Howard.

(Id. at 11.) Rico Howard is a 46-year old black male. Faust claims that he recognized Rico Howard from previous police dealings. Faust also believed that the "Howard" pickup was from earlier that day. (See Ginder Aff., Ex. C, State of Minnesota v. Rico Patrick Howard, Hennepin County Ct. Dist. File No. 00080738, Tr. of Officer Faust at Rasmussen Hr'g., 41, 56.) Nevertheless, the police officers agree that they did not recall any details about the pickup. Faust states:

> Q And at that time you just remembered the name Howard?
> A Just remembered the name Howard. I remembered there was a Howard on a pickup at roll call.

(Id. at 40.) Hoff states, "I just remembered the last name Howard." (Hoff Test. at 34.)

It is undisputed that there was no PC pickup issued the morning of August 22, 2000. In fact, there was no PC pickup issued on a "Howard" in the month of August. Rather, a PC pickup had been issued on July 25, 2000, on a LeRon Lee Howard. That PC pickup included two large photographs of LeRon Lee Howard and identified him as a 26-year old black male residing at 818 Washburn Avenue North, well outside Officer Faust's and Officer Hoff's precinct. It is also undisputed that neither officer attempted to verify any pickup.

Faust testifies further:

Q And then at some point, did you and Officer Hoff made (sic) a determination to make an investigatory stop of the defendant?
A We didn't verbally, but we kinda - - when we discussed, after passing him on 4th Avenue there, just kinda after working with him for awhile we kinda knew we were going to stop him.
Q And what were the reasons you were going to stop him? What was the basis for the stop?
A Well, it was kinda suspicious behavior that he's sitting at a stop sign.

. . .

(Faust Test. at 44-45). Officer Faust offers various reasons for suspicion, ranging from possible intoxication or medical problems to the fact that Rico Howard did not look at the officers when they passed and shined the alley light at him. (Id.)

Officer Hoff, recalling the decision to stop Rico Howard differently, offers yet another reason for the stop, asserting that this was when he *verbally* told Officer Faust that he was going to pull over Rico Howard:

Q As you went northbound on 4th Avenue, did you see what, if anything, the defendant did in his vehicle?
A I just watched him in my rearview mirror as Officer Faust and I talked about who it was. And then we decided - - he made a left-hand turn from 4th Avenue onto 44th Street to go east and he didn't signal, he just turned. I told Officer Faust, you know, I'm going to go pull this guy over.

(Hoff. Test. at 14). Nevertheless, neither police report indicates that Rico Howard failed to signal a left turn and that this was the basis for the stop. Moreover, Faust denied any verbalization of an agreement to stop Rico Howard: "We made the decision to pull him

over after we passed him. It's - - we didn't verbalize and say, we're going to stop him." (Faust Test. at 58.)

Notwithstanding the officers' testimony, the only basis articulated in both police reports for stopping Rico Howard was that the officers recalled a PC Pickup on "a Howard." In fact, Hoff noted with surprising specificity in his report, which nearly mirrors Faust's, that they were aware of a PC Pickup on a Howard for "Aggravated Assault."

Nevertheless, the officers did not turn around or otherwise attempt to stop Rico Howard at that time. Rico Howard had turned left and was traveling eastbound on 44th Street. The officers continued traveling northbound on 4th Avenue, away from Rico Howard's vehicle, allowing Rico Howard to drive out of sight. The officers then turned right to travel eastbound on 44th Street. Officer Hoff claims that he intended to circle around the block to follow Rico Howard. However, Rico Howard, as if by chance, turned left to travel northbound on 5th Avenue and met the officers again at the intersection of 43rd Street and 5th Avenue. Rico Howard stopped at the intersection and then proceeded through the stop sign. The officers then turned left onto 5th Avenue to travel northbound behind Rico Howard. About mid-block between 43rd Street and 42nd Street, the officers activated their emergency lights and Officer Faust radioed police dispatch of the traffic stop. Rico Howard pulled over to the curb and slowed down but did not stop his car.

Rico Howard then went through the stop sign at 42nd Street and 5th Avenue, and turned left, westbound, onto 42nd Street. The officers followed, activating their siren.

Rico Howard continued westbound, and went through a four-way stop at 42nd Street and 4th Avenue. At this point, the parties were traveling at low rates of speed at or below the speed limit. Officer Hoff estimated the speed at 10 to 20 miles per hour. Rico Howard again appeared to pull over to the curb, but continued driving. Rico Howard went through the next four-way stop at 42nd Street and 3rd Avenue without stopping, and turned left onto 3rd Avenue. The chase continued along 3rd Avenue. The officers contend that they were traveling three-fourths of a block behind Rico Howard at a rate of 15 to 20 miles per hour. The officers contend that within the 4400 block of 3rd Avenue, Rico Howard began to gain speed and pull away from their vehicle. However, a resident living at 44th Street and 3rd Avenue who had been sitting outside on his porch during the chase and saw the vehicles approaching from 43rd Street indicated that the speed of the two vehicles appeared constant, the vehicles were traveling an estimated 50 to 60 miles per hour, and the police vehicle was approximately 20 feet behind Rico Howard's vehicle. (Wandling Aff., Tulua Nuuvali Aff. ¶¶ 1-6.)

The officers continued to chase Rico Howard toward the intersection of 3rd Avenue and 46th Street in the residential neighborhood. Meanwhile, Jennifer Stebleton and Michael Slusarchuk, traveling eastbound on 46th Street in their vehicle, drove into the path of the high-speed chase. Stebleton, who was driving, had the right of way. Rico Howard, however, drove through the stop sign at the intersection and struck Stebleton's vehicle.

Stebleton was killed instantly by the impact. She was pronounced dead at the crash site. Slusarchuk, as passenger, was trapped and paralyzed, suffering multiple internal and external injuries. Specifically, Slusarchuk suffered a mitral valve injury, a spinal cord injury, and multiple fractures of his right arm. (See Wandling Aff., Ex. G, Hennepin County Medical Center, Operation Report, August 23, 2000.) Slusarchuk underwent C6-C7 cervical discectomy and fusion. (See Wandling Aff., Ex. H, Hennepin County Medical Center, Operation Report, August 26, 2000.) After the collision, Slusarchuk was in critical condition and comatose for weeks. He nearly died on several occasions, and endured numerous surgeries to repair his spine, heart, and broken bones. As a result of the collision, Slusarchuk is quadriplegic and will require the use of a wheelchair for the remainder of his life.

Sergeant John Dennig ("Dennig") of the Minnesota State Patrol prepared the crash reconstruction. Dennig determined that Rico Howard was traveling 68-76 miles per hour immediately prior to the collision and had not applied his brakes. Dennig determined that Stebleton had been traveling 24-26 miles per hour immediately prior to the collision and was not at fault for the collision.

Officer Faust completed a police report of the incident at 2:05 a.m. on August 23, 2000. That report provides, in pertinent part:

> Pursuant to Dept. Policy and Procedure I am giving the following statement. While working squad 334 with my partner, Officer HOFF, we were on routine patrol in a marked Police squad car. We were traveling EB on 44th St approaching 4th Ave. Officer HOFF, who was driving, stopped at the stop sign which is a 4-way stop. There was a vehicle on 4th Ave

facing SB stopped at the stop sign at 42nd St. This vehicle sat there for several seconds. Officer HOFF drove into the intersection then turned NB on 4th Ave and drove slowly past this vehicle. There was one black male occupant that I recognized as RICO HOWARD. Once I recognized this individual I turned to Officer HOFF and stated that the driver of the vehicle was RICO HOWARD. I recalled from roll call that there was a PC Pick Up on a HOWARD. I believed this PC Pick Up was on RICO HOWARD. It should be noted that I recognized HOWARD because I have had several contacts with him throughout my career.

Officer HOFF turned EB on 43rd St where he met up with HOWARD driving MN license 273-PBS NB on 5th Ave at this point. Officer HOFF followed this vehicle north on 5th Ave. Shortly before 42nd St, Officer HOFF activated the overhead lights to initiate a traffic stop. I called out over the radio that we were stopping this vehicle at 42nd St and 5th Ave. After radioing dispatch this information HOWARD driving slowly continued to 42nd St. He turned WB on 42nd St and continued driving slowly and not stopping. Officer HOFF at this point activated the siren and I radioed dispatch that this vehicle was not pulling over and that he was driving west on 42nd St. As we approached 4th Ave S, the vehicle slowed down but did not come to a complete stop for the stop sign. The vehicle continued west on 42nd St to 3rd Ave S where it slowed again for the stop sign but did not come to a complete stop. The vehicle then turned SB on 3rd Ave. I radioed dispatch that the vehicle had turned south on 3rd Ave. S. We continued following the vehicle with our lights and siren. Officer HOFF was following the vehicle approximately a quarter of a block behind. I radioed dispatch that the vehicle was continuing SB on 3rd and that it was occupied by one black male. As the vehicle approached 45th St it began to pick up speed. At this point I believed the suspect was attempting to flee officers. Before I could air anymore information the vehicle traveling very fast at this point went through the stop sign at 46th St and 3rd Ave S and struck another vehicle which was traveling east on 46th St. When the suspect vehicle struck the other vehicle I did not see any brake lights flashing on the suspect vehicle. I did see his taillights but did not see any brake lights being activated. When the accident happened we were approximately ¾ of a block away. Officer HOFF then sped up to get to the accident scene to render aid as I called out over the radio that we needed Rescue and Ambulance Code 3 for an accident.

Officer Hoff completed a police report of the incident at 2:35 a.m. on August 23, 2000. That report provides:

> Pursuant to Dept. Policy and Procedure I am giving the following statement. While worked Squad 334 with my partner, Officer FAUST, we were on routine patrol in a marked Police car. We were traveling EB on 44th St approaching 4th Ave. I was driving the squad and I observed a vehicle sitting on 4th Ave at 44th St facing SB. This intersection is a 4-way stop. I approached the intersection and came to a complete stop waiting for that vehicle to proceed through the intersection. This vehicle did not move so I made a left hand turn to go NB on 4th Ave. As I passed that vehicle I turned on my driver's side alley light and it shined on the driver of that vehicle to see if there was a problem in the car. There was a black male occupant sitting in the driver's seat and Officer FAUST stated that the driver was RICO HOWARD. We were aware that there was a PC Pick Up on a HOWARD for Aggravated Assault and we believed that the PC Pick Up was for Rico Howard.
>
> We observed the vehicle to make a left hand turn and go EB on 44th St. I made a right hand turn to go EB on 43rd St. As we approached 43rd St and 5th Ave, the vehicle was coming NB and stopped at 43rd and 5th. I stopped my squad and this vehicle then continued NB on 5th Ave approaching 42nd St. I pulled in behind the vehicle, MN 273-PBS. We were now traveling NB on 5th Ave. Shortly before reaching 42nd St I activated my overhead lights to conduct a traffic stop. Officer FAUST radioed dispatch informing them of the traffic stop. At this point HOWARD was not stopping and turned WB on 42nd St from 5th Ave. I activated my siren in an attempt to get HOWARD to stop the vehicle. HOWARD was still not stopping and traveling slowly. We approached 4th Ave and the vehicle slowed down but did not stop and still proceeded WB on 42nd St. We were traveling at approximately 15 to 20 MPH. The vehicle then proceeded SB on 3rd Ave, still continuing at approximately 15 to 20 MPH and refusing to stop [] I continued following with my lights and siren on and was approximately a quarter of a block behind the vehicle. HOWARD continued SB on 3rd and the vehicle approached 45th St it began to speed away from us at a higher rate of speed. At this point, I believed that the suspect was attempting to flee. Before Officer FAUST could air anymore information about the vehicle that was traveling fast it went through a stop sign at 46th St and 3rd Ave and struck another vehicle that was traveling east on 46th St. At the time of the crash we were approximately ¾ block away from it. I did not

see the suspect vehicle use his brake lights prior to entering the intersection. When I observed the accident happen, I sped up to the scene so I could see if any medical attention was needed.

On December 4, 2000, Judge Pamela Alexander of the Hennepin County District Court held a Rasmussen Hearing. (See Ginder Aff., Ex. C, State of Minnesota v. Rico Patrick Howard, Hennepin County Ct. Dist. File No. 00080738, Tr. of Rasmussen Hr'g.) On January 18, 2001, Judge Pamela Alexander concluded that officers had an articulable reasonable suspicion to stop Rico Howard. (Second Ginder Aff., State of Minnesota v. Rico Patrick Howard, Hennepin County Ct. Dist. File No. 00080738, Order of January 18, 2001.) On March 6, 2001, Rico Howard pled guilty to Murder in the Second Degree and to Fleeing a Police Officer in a Motor Vehicle Resulting in Great Bodily Harm. (See Ginder Aff., State of Minnesota v. Rico Patrick Howard, Hennepin County Ct. Dist. File No. 00080738, Guilty Plea Tr. at 3.)

In the underlying Complaints, Plaintiffs allege that Defendants violated their constitutional rights protected by 42 U.S.C. § 1983 by depriving them of liberty without due process of the law, unreasonable seizure, unreasonable interference, unreasonable force, and substantive due process. Plaintiffs also allege a Monell claim against the City of Minneapolis. Plaintiffs further allege that Defendants conspired to deprive them of their constitutional rights. Finally, Plaintiffs assert claims of negligence against Defendants. Defendants have moved for summary judgment. Plaintiffs now waive their claims for constitutional violations relating to unreasonable searches and seizures, use of excessive force, and Monell liability against the City of Minneapolis. (See Pl. Mem. at

35.) Plaintiffs continue to argue their substantive due process and conspiracy claims. (Id.) The Court heard oral argument in the matter on September 20, 2002, at 2:00 p.m., and will address these issues in turn.

## DISCUSSION

### A. Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. See Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik, 47 F.3d at 957. The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. See Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).

### B. Qualified Immunity

Defendants have raised the defense of qualified immunity. Qualified immunity is "an entitlement not to stand trial or face the burdens of litigation" and is "an immunity from suit rather than a mere defense to liability." Saucier v. Katz, 533 U.S. 194, 200

(2001) (citations omitted). In passing on the qualified immunity defense, a court must determine whether the facts alleged, taken in the light most favorable to the injured party, demonstrate that the officer's conduct violated a constitutional right, and if so, whether that right was clearly established at the time of the events in question. Id. at 201.

**1. Constitutional Violations**

Plaintiffs argue that Officers Hoff and Faust attempted to stop Rico Howard without justification and engage him in a vehicular pursuit in violation of his Fourteenth Amendment rights. Plaintiffs point to the various inconsistencies in the officers' police reports and testimony to support their position that the officers not only knew that they attempted to pull over Rico Howard without justification, but also that they attempted to cover up this fact. Plaintiffs point to other evidence such as witness affidavits and the crash reconstruction to further demonstrate the inconsistency in the officers' testimony and reports. Plaintiffs argue that the officers were engaged in racial profiling when they decided to stop Rico Howard. Finally, Plaintiffs argue that because the primary constitutional violation upon which they rely involves "the stop" rather than "the pursuit" of Rico Howard, the deliberate indifference standard is appropriate to analyze these claims.

Plaintiffs further argue that Officers Hoff and Faust conspired to deprive Rico Howard of his constitutional rights. Plaintiffs assert that the evidence demonstrates the officers reached a meeting of the minds in their agreement to stop Rico Howard, who was not engaged in any illegal activity. Plaintiffs again point to the officers' police reports,

arguing that they "almost exactly mirror each other" and "misrepresent various aspects of the pursuit of Rico Howard."

Defendants, in turn, argue that under the Lewis intent-to-harm standard, the officers did not violate Rico Howard's substantive due process rights. Defendants argue that the officers pursued Rico Howard in a "very short, five or six block chase in order to stop the fleeing Howard vehicle and apprehend Howard." (Def. Mem. at 16.) Defendants further argue that Plaintiffs are estopped from claiming that the officers did not have reasonable suspicion to stop Rico Howard, based on Judge Pamela Alexander's findings in the criminal matter of State of Minnesota v. Rico Patrick Howard, Hennepin County Ct. Dist. File No. 00080738, Order of January 18, 2001. Defendants argue that, at any rate, under a totality of circumstances, the officers had a reasonable suspicion to stop Rico Howard. Defendants argue that the officers' version of the facts is largely uncontested, including that Defendant failed to activate his left turn signal. Defendants also dispute that the officers ever admitted to seeing the PC Pickup on the morning of the attempted stop. In short, Defendants argue that Plaintiffs have failed to produce any evidence that the officers had any intent to harm Rico Howard or worsen his legal plight. Defendants argue that even if a constitutional violation were found, it was not clearly established. Finally, Defendants argue that there is no evidence that the officers had an opportunity to meet and discuss their reports before they were prepared, or that they otherwise conspired to violate Rico Howard's constitutional rights.

Fourteenth Amendment

The United States Constitution guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, sec. 1. The Supreme Court has interpreted this provision to guarantee more than fair process. Washington v. Glucksberg, 521 U.S. 702, 719 (1997). Indeed, the Court has interpreted this provision to govern substantive process as well, "barring certain government actions regardless of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331 (1986). "The touchstone of due process is protection of the individual against arbitrary action of government." Dent v. West Virginia, 129 U.S. 114, 123 (1889). The Due Process Clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression. See County of Sacramento v. Lewis, 523 U.S. 833, 840, 845-6 (1998) (citations omitted). The Supreme Court has recognized as actionable executive abuse of power that "shocks the conscience" or interferes with rights implicit in the concept of ordered liberty. Id. at 846. Official conduct that "shocks the conscience" and violates the "decencies of civilized conduct" offend our notions of due process. Id. (citation omitted). The Constitution does not guarantee due care on the part of officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. Id. at 849. Conversely, conduct intended to injure in some way is unjustifiable by any government interest and is the sort of official action most likely to rise to the conscience-shocking level. Id. (citation omitted).

The "shocks the conscience" test is "no calibrated yard stick," but merely "point[s] the way" to what type of conduct the Fourteenth Amendment proscribes. Id. at 847. The Fourteenth Amendment has been said to protect deeply rooted feelings of the community and the fundamental principles of liberty and justice. See Herbert v. Louisiana, 272 U.S. 312, 316 (1926). Indeed, it protects rights basic to our free society. The Fourteenth Amendment protects against the arbitrary restraint of liberty by government officials. See Hurtado v. California, 110 U.S. 516, 527 (1884).

Intent-to-Harm/Worsen the Legal Plight Standard

With respect to Plaintiffs' argument concerning the appropriate standard to be applied in this case, the Court agrees with Justice Bye's opinion concurring in part and dissenting in part, that the intent-to-harm/worsen the legal plight standard ill fits the § 1983 claim involved here. See Helseth v. Burch, 258 F.3d 867, 876-77 (8th Cir. 2001). Nevertheless, we must follow that standard, as the Helseth majority was clear. The "'intent-to-harm' standard of Lewis applies to all § 1983 substantive due process claims based upon the conduct of public officials engaged in a high-speed automobile chase aimed at apprehending a suspected offender." Id. at 871. The Lewis intent-to-harm standard applies regardless of whether a suspect or bystander is hurt. Id. "[H]igh speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." Lewis, 523 U.S. at 854. "[O]nly a purpose to cause harm unrelated to the

legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." Id. at 836.

Lewis involved an officer's high-speed pursuit of a motorcyclist who had already been speeding when the officer encountered him, and ended in the death of the motorcyclist's passenger. Id. at 833. In Lewis, the Supreme Court, reversing the Court of Appeals, concluded that the allegations and evidence were not sufficient to state a substantive due process claim. Id. The Court reasoned that Petitioner was faced with "a course of lawless behavior for which the police were not to blame," as the officers had done nothing to cause the high-speed chase in the first place. Id. at 855. The Court determined that the officer's instinct was to do his job as a law enforcement officer, not to induce lawlessness or to terrorize, cause harm, or kill. Id. The Court found that there was no reason to believe that Smith's actions were tainted by an improper or malicious motive. Id.

Similarly, Helseth involved officers' high-speed pursuit of a vehicle traveling 111 miles per hour, which ended with a crash that killed and injured innocent bystanders. Helseth, 258 F.3d at 869. One of the injured bystanders filed a § 1983 action against one of the officers involved. Applying the Eighth Circuit's standard in Feist v. Simonson, 222 F.3d 455, 464 (8th Cir. 2000), the district court denied qualified immunity on the basis that the evidence could support a finding that the officer conducted the pursuit with deliberate indifference to public safety and the plaintiff's rights. Alternatively, applying the Lewis standard, the court denied qualified immunity on the basis that the evidence

could support a finding that the officer intended to harm the driver and his passengers by engaging in Pursuit Intervention Tactic ("PIT") maneuvers. The Eighth Circuit reversed and remanded, holding that the Lewis standard applies to all § 1983 substantive due process claims based on the conduct of public officials engaged in a high-speed automobile chase aimed at apprehending a suspected offender. Helseth, 258 at 871. The Court further concluded that there was no violation of the plaintiff's rights under the Due Process clause. Id. at 872. The Court reasoned:

> Here, the undisputed evidence is that [the officer] employed the PIT maneuvers in an attempt to stop the fleeing [] vehicle and apprehend its driver. The only harm intended by this conduct was incidental to [the officer's] legitimate objective of arresting [the driver]. That intent does not, as a matter of law, establish a substantive due process violation.

Id. With these cases "pointing the way" with respect to the intent-to-harm/worsen the legal plight standard, the Court now turns to the facts of the present case.

When officers encountered Rico Howard, he was stopped legally at a stop sign. This is where the Court's analysis begins. Unlike the "suspected offenders" in Lewis and Helseth, Rico Howard was not already traveling at high rates of speed or otherwise engaged in unlawful conduct to prompt a response, and the officers were not faced with a "course of lawless behavior" that required police action. Yet, from the moment officers saw him stopped legally at the stop sign to the pursuit that followed, Rico Howard's legal plight worsened. A reasonable jury could conclude that the officers' initial decision to stop a law-abiding Rico Howard amounts to the type of conduct to which the Supreme Court referred when recognizing that a §1983 action is redressible in situations where an

officer intends to worsen a suspect's legal plight. See Lewis, 523 U.S. at 854 & n. 13 (discussing Checki v. Webb, 785 F.2d 534 (5th Cir. 1986). Indeed, such conduct would amount to the type of arbitrary government action the Fourteenth Amendment protects against. The Court agrees, as Plaintiffs contend, that such a right was clearly established at the time these events occurred. Accordingly, based on the facts of this case, Plaintiffs, the innocent victims of the high-speed chase, survive summary judgment on their Fourteenth Amendment claim.

Collateral Estoppel

Finally, Defendants argue that Plaintiffs are collaterally estopped from arguing that the officers had no reasonable articulable suspicion to stop Rico Howard's vehicle, based on Judge Pamela Alexander's findings in the criminal matter of State of Minnesota v. Rico Patrick Howard, Hennepin County Ct. Dist. File No. 00080738, Order of January 18, 2001. However, the Eighth Circuit has recognized that collateral estoppel cannot be used to bar a party from litigating an issue decided previously in a criminal proceeding in a subsequent civil proceeding when that party was not in privity with a party to the prior action and did not have an opportunity to fully and fairly litigate the issue in the prior proceeding. Turpin v. County of Rock, 262 F.3d 779, 782-83 (8th Cir. 2001) (concluding that "[c]ollateral estoppel cannot be used against the officers in our case, as the officers were neither parties nor in privity with the State in the criminal action and did not have a full and fair opportunity to litigate the issues in the criminal action."); see also Duncan v. Clements, 744 F.2d 48, 51-52 (8th Cir. 1984)(concluding that state court's finding that

arrest and search were unconstitutional could not be used offensively against arresting officer in subsequent civil rights suit because interests of State in criminal proceeding were not identical to personal interests of individual officer and, thus, officer was not in privity with State, and officer did not have full and fair opportunity to litigate at suppression hearing as he had no control over State's presentation of its case). Minnesota law on collateral estoppel requires "the issue in the current action to be the same issue adjudicated in the earlier proceeding and that the parties subject to estoppel have had a full opportunity to previously litigate the issue." Gulbranson v. Gulbranson, 408 N.W.2d 216, 218 (Minn. App. 1987)(emphasis in original). Collateral estoppel is appropriate when (1) the issue is identical to the issue in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard in the adjudicated issue. Carlson v. County of Hennepin, 428 N.W.2d 453, 457 (Minn. App. 1988). In this case, it is fair to say that Plaintiffs were neither in privity with Rico Howard nor given a full and fair opportunity to be heard in the prior criminal matter. Accordingly, collateral estoppel does not apply.

**2. Conspiracy to Violate Civil Rights**

In order to prove a conspiracy to violate civil rights, a plaintiff must demonstrate that (1) the defendant conspired with others to deprive him or her of a constitutional right; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; (3) the overt act injured the plaintiff; and (4) actual depravation of a

constitutional right occurred. Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999). A plaintiff must demonstrate "'the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding,' and [provide] some facts suggesting such a 'meeting of the minds.'" Haley v. Dormire, 845 F.2d 1488, 1490 (8th Cir. 1988). Plaintiffs have presented facts that would demonstrate a mutual understanding between the officers. Plaintiffs have presented evidence from which reasonable jurors could conclude that the officers came to a mutual understanding "to initiate a stop of an individual who was not engaged in any illegal or adequately suspicious activity simply because he was African-[A]merican and shared the same last name as an individual identified in a PC pickup." (See Pl. Mem. at 33.) Plaintiffs have presented evidence that the officers' police reports "almost exactly mirror each other" and "misrepresent various aspects of the pursuit of Rico Howard." (Id.) Finally, as previously discussed, Plaintiffs have presented evidence that could establish the underlying substantive due process violation.

**CONCLUSION**

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**;

2. Defendants' motion is **GRANTED** with respect to Plaintiffs' claims for constitutional violations relating to unreasonable searches and seizures, use of excessive force, and Monell liability against the City of Minneapolis; and

3. Defendants' motion is **DENIED** with respect to Plaintiffs' substantive due process and conspiracy claims.

Dated: 10-31-02

Michael J. Davis
Michael J. Davis
United States District Court